# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DAPPER LABS INC., | ) | Case No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **COMPLAINT FOR: (1) FALSE** |
| | ) | **DESIGNATION OF ORIGIN (15 U.S.C. §** |
| | ) | **1125(a)(1)(A)); (2) VIOLATION OF** |
| EMILY GOETZ and JOHN DOES Nos 1 to 25, | ) | **ANTICYBERSQUATTING CONSUMER** |
| | ) | **PROTECTION ACT (15 U.S.C. § 1125(d));** |
| Defendants. | ) | **(3) COMMON LAW TRADEMARK** |
| | ) | **INFRINGEMENT; (4) COMMON LAW** |
| | ) | **UNFAIR COMPETITION** |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |

Plaintiff DAPPER LABS INC. ("Dapper") asserts the following claims against

Defendants Emily Goetz ("Goetz") and John Does Nos 1 to 25 (Goetz and John Does Nos 1 to

25 are collectively referred to as "Defendants"):

## NATURE OF ACTION

1.      This is an action for damages and injunctive relief for (1) false designation of

origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) violation of the

Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); and (3) related claims for

trademark infringement and unfair competition arising under the common law.

2.      Dapper is a world-renowned developer in the blockchain, cryptocollectible, and

cryptocurrency space.  Its first product was the 2017 release of *CryptoKitties*, which was one of

the world's first blockchain games.  Built on the blockchain platform Ethereum, *CryptoKitties*

allows users to collect and breed digital cats using blockchain technology, which offers users the

security and peace-of-mind that each of the collectible digital cats is unique and cannot be

replicated or destroyed.

3.      The *CryptoKitties* game exploded in popularity, garnering Dapper many media and social media mentions and immediately establishing Dapper as a leader in the blockchain space.  The popularity of *CryptoKitties* resulted in a highly publicized (and lengthy) slowdown of the Ethereum blockchain platform, which was overwhelmed by the number of users wanting to trade and collect the digital cats.  For example, Bloomberg reported on December 4, 2017 that "CryptoKitties Mania Overwhelms Ethereum Network's Processing."  BBC News reported on December 5, 2017 that "CryptoKitties craze slows down transactions on Ethereum."  And The Wall Street Journal reported on December 7, 2017 that "Ethereum Network Copes With Surge of Activity as Virtual Kitten Game Goes Viral."

4.      Through its experience with *CryptoKitties* and its subsequent efforts, Dapper identified various weaknesses in the then-current blockchain platforms available—including the Ethereum blockchain platform on which the *CryptoKitties* game was built.  As a result, Dapper began developing a new blockchain that would enable decentralized applications to operate at scale without the problems or compromises experienced on other blockchain platforms.  This newly-developed blockchain would allow blockchain-based execution to operate faster, enabling other developers and users to develop their own applications, release them on the new blockchain, and enjoy optimal performance.

5.      Dapper named this new, first-of-its-kind blockchain *Flow* (the "*Flow* Blockchain").  The *Flow* Blockchain is a fast, decentralized, and developer-friendly blockchain, designed as the foundation for the creation of a new generation of games, apps, and the digital assets that power them.  Dapper's use of the term "Flow" (the "FLOW Mark") in connection with the *Flow* Blockchain, and all games, applications, and products utilizing the *Flow*

4843-6341-7820

Blockchain, alerts consumers that the associated product is based on or built to operate in conjunction with the innovative *Flow* Blockchain platform, which was developed by the same team that created the celebrated *CryptoKitties* game.

6.      Dapper first publicly announced the development of the *Flow* Blockchain in September 2019.  The design of the *Flow* Blockchain allowed for a "playground," as Dapper coined it, in which developers could start learning and building games and applications.  This "playground" became available for the public to develop on in March 2020.

7.      Based upon the goodwill and reputation established by *CryptoKitties*, there was enormous interest in the *Flow* Blockchain.  Amongst other potential collaborations, Dapper signed binding contracts to develop blockchain-based games and applications utilizing the *Flow* Blockchain in partnership with such famous, international brands as the NBA, UFC, Dr. Seuss, and Sanrio.  For example, in conjunction with the NBA, Dapper developed and launched a wildly popular game built on the *Flow* Blockchain called *NBA Top Shot*, discussed in further detail below.

8.      In connection with the *Flow* Blockchain, Dapper planned to release a fungible token (the "*Flow* Token").  Such tokens, sometimes colloquially called "cryptocurrency," are fundamental to all blockchain platforms.  For example and most typically, consumers pay to access the digital experiences that exist on blockchain platforms by using the tokens the network accepts.  This is widely understood in the industry, and the *Flow* Blockchain is no exception.  Dapper began sharing information publicly about the forthcoming *Flow* Token on its website and in articles as early as March 2020.

9.      Approximately one year after Dapper first announced the *Flow* Blockchain—and several months after the *Flow* Blockchain "playground" was available for developers' use, and

-3-

several games and applications utilizing the *Flow* Blockchain had already been announced or released—a user on the website Reddit announced that they were "the developer behind the new 'self-distributing store of value' token, FLOW." Upon information and belief, that Reddit user was Defendant Goetz.

10.    This new token—which is not affiliated with Dapper, the *Flow* Blockchain, or the *Flow* Token—is not based on the innovative *Flow* Blockchain developed by Dapper. Instead, it is based on the traditional Ethereum blockchain (which had previously buckled under the pressure of the overwhelming popularity of *CryptoKitties*). Defendant Goetz marketed Defendants' infringing token under the name "Flow Protocol" (the "FP Token"). The use of the identical word "FLOW" in the FLOW Mark in the name of the FP Token has already caused and is likely to continue to cause confusion, and infringes on Dapper's rights in the mark. In particular, consumers would reasonably (but incorrectly) believe that the FP Token is associated with the *Flow* Blockchain and with Dapper, when in fact the FP Token is built on the Ethereum blockchain and is not associated with Dapper in any way. One Reddit user responded to Goetz's announcement by referring to the FP Token as "100% a scam" due to it not being affiliated with Dapper or the *Flow* Blockchain.

11.    That same day, on August 12, 2020, the first transfer of an FP Token was listed on Etherscan under the confusingly similar ticker symbol $FLOW. Four days later, on August 16, 2020, public trading of FP Tokens opened at a price per token of $0.41. The FP Token reached its highest value on August 20, 2020 with a high of $2.20 per token. However, in the following weeks and months, the exchange value of the FP Token plummeted. This decrease in price was accompanied by online criticism of the FP Token.

12.    Dapper first became aware of Defendants' FP Token on or around August 20,

2020.  Upon that discovery, Dapper undertook a diligent investigation in an attempt to identify the developer of the FP Token to enforce its senior trademark rights over the FLOW Mark. Upon information and belief, the developer of the FP Token was purposefully attempting to remain anonymous and referred to themselves online with pseudonyms including "Morpheus." Eventually, Dapper sent a cease-and-desist letter in October 2020 to the domain name registrar of Defendants' <flowprotocol.io> domain name—the only possible recipient it could identify— and about a week later received a response from an attorney, Grant Gulovsen, who Dapper understood to be representing the developer of the FP Token (who upon information and belief is Defendant Goetz).  Over the next two months, Dapper exchanged correspondence with Mr. Gulovsen, but at no time did Defendants agree to remove references to the name "Flow Protocol," change the <flowprotocol.io> domain, or rename the $FLOW ticker symbol. Communications broke down after counsel for Defendants began providing only dilatory and non-substantive responses, and the parties were unable to resolve the dispute.

13.      By January 2021—at the same time that Dapper was attempting to reach an agreement with Defendants to cease Defendants' infringing use of the FLOW Mark—there were sufficient *Flow* Tokens circulating on the *Flow* Blockchain that cryptocurrency exchanges, such as Kraken, decided to list the *Flow* Token for exchange, making it freely available for purchase by eligible members of the public (outside of the United States and Canada) for the first time.[1] On January 27, 2021, the *Flow* Token began trading on the Kraken exchange internationally (outside of the United States and Canada) with an opening price of $0.38, and that same day was trading as high as $8.00 per token.  By February 1, 2021, the *Flow* Token was trading on average

---

[1]      In September and October 2020, Dapper had also conducted a limited sale of *Flow* Tokens to eligible purchasers outside of the United States and Canada, but such tokens were, and still are, restricted from sale or exchange until a minimum of one year after purchase.

around $10.00 per token (with a price ranging between approximately $9.05 and $12.07).

14.     Notably, on January 27, 2021—the same day that the *Flow* Token was listed on Kraken—the trading price of Defendants' FP Token, after having stagnated for months, increased by 250%.  The number of daily transfers of the FP Token also increased by approximately 750%.  The number of unique addresses for the transfers increased by approximately 490%, and the number of FP Tokens transferred on January 27, 2021 increased by more than 1,200%.  On information and belief, these drastic increases to the FP Token's value were no coincidence, and were instead the result of the *Flow* Token being listed on exchanges internationally that same day.  Consumers confused by the use of the FLOW Mark in the name of the FP Token mistakenly believed that they were purchasing a *Flow* Token, or a product affiliated with or sponsored by Dapper.  They were not.

15.     This likelihood of confusion caused by Defendants' infringing use of the FLOW Mark harms consumers because they mistakenly purchase FP Tokens—which have been criticized in the blockchain and cryptocurrency community—believing that they are based on the innovative *Flow* Blockchain, or that they are affiliated with Dapper and the creative team behind *CryptoKitties* and *NBA Top Shot*.  As further discussed below, the confusion further harms Dapper's business, reputation, and goodwill.

16.     To protect its customers, American consumers at large, and its business, reputation, and goodwill, Dapper hereby brings these claims against Defendants for temporary, preliminary, and permanent injunctive relief, damages, attorneys' fees and costs, and such other relief as may be awarded by this Court.

## THE PARTIES

17.     Dapper is a corporation duly organized and existing under the laws of the

4843-6341-7820

province of British Columbia with its principal place of business located in Vancouver, British

Columbia.  Formed in 2018, Dapper is a technology company that develops and provides

decentralized, blockchain-based games, applications, and experiences to consumers.

18.     Defendant Goetz is an individual residing and domiciled in Brooklyn, New York.

Upon information and belief, Goetz is the developer of the FP Token and the operator of the

business known as Flow Protocol.

19.     The true names and capacities, whether individual, corporate, associate, or

otherwise, of Defendants John Does Nos 1 to 25, inclusive, are presently unknown to Dapper,

who therefore sues said defendants by such fictitious names.  Dapper will amend the Complaint

to show their true names and capacities when the same have been ascertained.

20.     Dapper is informed and believes, and on that basis alleges, that Defendants John

Does Nos 1 to 25 include individuals and entities that have acted in collaboration or concert with

Defendant Goetz in any or all unlawful acts as alleged herein, including but not limited to: (1)

the owner of the <flowprotocol.io> domain name, if not Goetz; (2) any corporate entity or

entities that assisted with the development, marketing, promotion, or issuance of the FP Token;

and (3) any other person or entity acting in collaboration or concert with or as agent for Goetz or

any related corporate entity providing goods and services related to the FP Token under the

FLOW Mark.

## JURISDICTION AND VENUE

21.     Jurisdiction of this action is premised upon 15 U.S.C. § 1121 and 28 U.S.C. §§

1331, 1338(a), and 1338(b).  The Court has supplemental jurisdiction over the state common law

claims under 28 U.S.C. § 1367(a).

22.     This Court has personal jurisdiction over Defendant Goetz because Goetz is

domiciled in the State of New York.  In addition, this Court has personal jurisdiction over all Defendants because they have been actively promoting, advertising, distributing, offering for sale, and/or selling the FP Token at issue in this Complaint in this State and this Judicial District, and which activities have caused and will continue to cause injury and damage to Dapper within this State and this Judicial District, and further because Defendants continuously and systematically conduct, transact, and solicit business in this State and within this Judicial District.

23.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts, events, and omissions giving rise to Dapper's claims occurred in this Judicial District and in this State.

## ALLEGATIONS COMMON TO ALL CLAIMS

### DAPPER IS WELL-KNOWN IN THE BLOCKCHAIN, CRYPTOCOLLECTIBLE, AND CRYPTOCURRENCY SPACE

24.    Dapper became well-known in the blockchain space with the release of *CryptoKitties* in November 2017.  *CryptoKitties* is a highly popular blockchain-based game developed by Dapper's parent company, Launch Labs, Inc. (dba Axiom Zen) ("Axiom Zen"). The game was built upon the Ethereum blockchain platform, and it was one of the earliest uses of blockchain technology for gaming and entertainment.  Upon the success of *CryptoKitties*, and the significant positive reputation it garnered, Dapper was spun-off from Axiom Zen in early 2018 to develop new blockchain applications and technology to drive mainstream adoption.

25.    The *CryptoKitties* game, which was originally launched on the Ethereum blockchain network, achieved such early success that at one point it accounted for approximately 25% of Ethereum's traffic and, as of February 2021, accounted for more than 6.5 million

transactions.

26.     In 2019 alone, *CryptoKitties* generated more than 2 million transactions—the most of any consumer decentralized application on Ethereum—making *CryptoKitties* the fourth-largest decentralized application on Ethereum overall.  By this time Dapper had become a major, well-known, and famous player in the blockchain space.

27.     The early popularity of *CryptoKitties* resulted in a highly publicized slowdown of the Ethereum blockchain platform, which was overwhelmed by the number of users wanting to trade, breed, and collect the unique digital cats.  For example, Bloomberg reported on December 4, 2017 that "CryptoKitties Mania Overwhelms Ethereum Network's Processing."  BBC News reported on December 5, 2017 that "CryptoKitties craze slows down transactions on Ethereum." And The Wall Street Journal reported on December 7, 2017 that "Ethereum Network Copes With Surge of Activity as Virtual Kitten Game Goes Viral."

28.     The inefficiencies that Dapper experienced with the rollout of *CryptoKitties* on the Ethereum blockchain platform helped to inspire Dapper to pursue its next big project: a new and highly innovative blockchain platform that was optimized for usage and user/developer experience to handle global scale applications, including blockchain based entertainment and cryptocollectible games such as *CryptoKitties*.

## DAPPER DEVELOPS AND ADVERTISES *FLOW* BLOCKCHAIN AS AN ALTERNATIVE TO TRADITIONAL BLOCKCHAINS

29.     Following the overwhelming success of *CryptoKitties*, Dapper continued to develop new blockchain-based games and other entertainment applications.  This included collaborations with well-known brands.  For example, on July 31, 2019 the National Basketball Association ("NBA") announced a partnership with Dapper to "bring [a] first-of-its-kind

4843-6341-7820

blockchain game to basketball fans around the globe."

30.     To better create and support its upcoming blockchain-based games and apps,

Dapper began developing a new blockchain built to enable decentralized applications at scale:

the *Flow* Blockchain.  This was especially important to Dapper due to the highly publicized

slowdown of the Ethereum blockchain platform caused by *CryptoKitties*' popularity.  The *Flow*

Blockchain is a fast, decentralized, and developer-friendly blockchain, designed as the

foundation for a new generation of games, applications, and the digital assets that power them.

Applications on the *Flow* Blockchain platform allow consumers to maintain control of their own

data, create new kinds of digital assets tradable on open markets accessible from anywhere in the

world, and build open economies owned by users that help make them valuable.

31.     The *Flow* Blockchain's innovative design made it more efficient for true usage of

high-volume applications, including blockchain-based entertainment and cryptocollectible games

such as *CryptoKitties*.  For example, on a traditional blockchain, every node (i.e., computers that

contribute to the network's operations by running the blockchain software) stores the entire state

(account balances, smart contract code, etc.) and performs all the work associated with

processing every transaction in the chain.  The *Flow* Blockchain, on the other hand, has a

pipelined architecture that separates the job typically done by a single node across five different

node types, significantly reducing redundant effort and thus improving efficiency.  Dapper

developed an innovative, new cryptographic technique to support that approach.

32.     Dapper first adopted and used the FLOW Mark in connection with its *Flow*

Blockchain in or around August 2019, when it created a Twitter account with the handle

"@flow_blockchain."[2]

33.   On September 12, 2019, in an article titled "Introducing Flow, a new blockchain from the creators of CryptoKitties," Dapper announced that it would be launching the *Flow* Blockchain.  *See* **Exhibit A**.  The article explained in detail how the *Flow* Blockchain differed from traditional blockchain platforms.

34.   The use of the FLOW Mark in association with the *Flow* Blockchain, and with Dapper's games and applications built on the *Flow* Blockchain, helps consumers distinguish between games and applications that use the *Flow* Blockchain from those that use slower, less efficient, traditional blockchains.

35.   Continuing to build on the goodwill it received from the successfully published first technical papers for the *Flow* Blockchain—as well as the previously announced collaboration with the NBA—on February 25, 2020 Dapper announced a new partnership with the Ultimate Fighting Championship ("UFC") to create crypto-backed digital assets and an accompanying blockchain game for mixed martial arts fans around the world.  The collaboration—named "UFC on Flow"—once again used the FLOW Mark to inform consumers that this blockchain game was supported by the *Flow* Blockchain.

36.   At the same time, Dapper was making the *Flow* Blockchain publicly available for developers and other users to develop games and applications for use on the *Flow* Blockchain. In March 2020, the *Flow* Blockchain "playground" (as Dapper called it) was made publicly available for developers to access.  The positive response was swift.  Developers throughout the

---

[2]   Dapper has a pending application for its logo (consisting of a stylized "f" and the FLOW Mark) with a stated date of first use as early as September 18, 2020.  The claimed date of first use pertains to the date when Dapper began using the stylized logo; as alleged herein, Dapper started using the FLOW Mark as a word mark in connection with the applied-for services at least as early as March 2020.

United States were able to begin building on the *Flow* Blockchain platform.  In May 2020, Dapper initiated a "testnet" of the *Flow* Blockchain, which allowed developers to submit transactions to the network and create the canonical blockchain.

37.     Since its initial public release, more than 1,400 developers have used and built on the *Flow* Blockchain "playground" throughout the United States.  This includes at least 332 users in California, 155 users in New York, 124 users in Washington, 97 users in Florida, 87 users in Texas, 55 users in New Jersey, 53 users in Pennsylvania, 49 users in Illinois, 44 users in Massachusetts, and 47 other users throughout the United States.

38.     In May 2020, Dapper's collaboration with the NBA—named *NBA Top Shot*—launched in beta testing.  At the launch of the *NBA Top Shot* beta testing, it was advertised as being built on the *Flow* Blockchain.  *See* **Exhibit B**.  Users were able to purchase cryptocollectible packs, and digital NBA player video highlights called "moments."

39.     Given the success of the *Flow* Blockchain, Dapper continued to secure and announce collaborations with some of the most famous brands in the United States.  For example, in a July 21, 2020 article titled "Dr. Seuss digital collectibles on Flow, by the creators of CryptoKitties," Dapper announced a collaboration that would bring the colorful characters of the Dr. Seuss universe to the *Flow* Blockchain.

40.     On August 5, 2020, The Block reported that Dapper had sold $1.2 million worth of digital NBA player cards on the *Flow* Blockchain through *NBA Top Shot* during the beta testing phase alone.  That same day, *NBA Top Sho*t exited the private beta testing phase with the public launch of the "Marketplace," where users could trade and exchange digital NBA player cards with other users.  *See* **Exhibit C**.

41.     Products built on the *Flow* Blockchain continue to be wildly popular with users,

4843-6341-7820

and continue to make headlines.  For example, *NBA Top Shot* was widely reported and discussed in January 2021 following multiple high-value sales of digital NBA moments on the *Flow* Blockchain.  During one twenty-four-hour period alone, over $7 million dollars in transactions were processed on the *NBA Top Shot* Marketplace.  And as of February 2021, in just the six months since the game was publicly available, *NBA Top Shots* boasts more than 30,000 users and has transacted nearly $50 million on the Marketplace alone.

<u>DAPPER DEVELOPS, ADVERTISES, AND SELLS THE FLOW TOKEN</u>

42.     Dapper also planned to release a fungible cryptocurrency token: the *Flow* Token. It is widely understood in the blockchain space that any blockchain network, such as the *Flow* Blockchain, must have a native token.  This is because the *Flow* Blockchain is a software platform on which users pay to access the digital experiences by using the native token—in this case, the *Flow* Token, for the *Flow* Blockchain—to make payment.  Native tokens are made available to users of the blockchain community through a variety of mechanisms.  At various stages in the development of a blockchain network, tokens may be: purchased (such as through a private or public sale of tokens); earned (as compensation for participants using their computer processing unit's power to verify transactions on the blockchain, commonly known as "mining"); or traded (through cryptocurrency exchange markets), among other methods.

43.     The *Flow* Token is key to maintaining and operating the *Flow* Blockchain.  First, in order to access and use the *Flow* Blockchain, a user must pay transaction fees in *Flow* Tokens; such transactions can include a developer deploying a smart contract (a program that runs on the blockchain) to a consumer utilizing such smart contract (running the computation on the blockchain).  Second, in order to become one of the decentralized "nodes" on which the *Flow* Blockchain operates, node operators must "stake" *Flow* Tokens as an economic incentive

alignment mechanism.  The collective activities of the node operators comprise the blockchain. The *Flow* Blockchain rewards node operators for their contributions of running the blockchain by distributing transactions fees paid to the network and newly created *Flow* Tokens; conversely, malfeasance by a node operator results in such stake to be "slashed", or forfeited, as a penalty. Third, participation in the governance and ongoing operation of the *Flow* Blockchain platform is based on holding the *Flow* Token. Additionally, developers can incorporate the *Flow* Token in their applications as the primary currency used for payments and as a medium of exchange.

44.     As early as March 2020, Dapper stated on its website for the *Flow* Blockchain (<onflow.org>) that "[a] significant allocation of Flow tokens will be reserved for early user- and developer growth."  In a CoinDesk Article dated March 5, 2020 titled "The Team Behind CryptoKitties is One Step Closer to Leaving Ethereum," it was also announced that Dapper was "planning a token sale later [that] year."  The *Flow* Token was designed to be the native asset for the *Flow* Blockchain that is used by validators, developers, and users to participate within the *Flow* Blockchain network.

45.     By July 2020, both the technological primer for *Flow* Blockchain and the FAQs listed on <onflow.org> referenced that the *Flow* Token would be available for purchase shortly. Thus, by March 2020 the issuance of the *Flow* Token was known publicly and subsequently widely publicized.  The public, already aware of the FLOW Mark in connection with the Flow Blockchain, knew the FLOW Mark would also imminently represent the source of the *Flow* Token.  While having a native token like the *Flow* Token is axiomatic in the blockchain world, these public announcements cemented this understanding in the public's mind by mid-2020.

<u>DEFENDANTS' INFRINGEMENT OF THE FLOW MARK IN THE FP TOKEN AND</u>

<u>RESULTING CONSUMER CONFUSION</u>

46.    A year after Dapper first announced the *Flow* Blockchain—and several months after the *Flow* Blockchain and applications advertised as utilizing the *Flow* Blockchain became fully available to users—Defendants announced that they would begin selling the FP Token, which used the identical word "Flow."

47.    On August 12, 2020, on the forum website Reddit, a user with the handle "u/got-your-back" stated that they were "the developer behind the new 'self-distributing store of value' token, FLOW."  Upon information, the Reddit user with the handle "u/got-your-back" is Defendant Goetz, and this post was announcing the release of the FP Token.

48.    Recognizing that the use of the FLOW Mark in the name of the new FP Token was confusingly similar to the existing use of the FLOW Mark in the *Flow* Blockchain, another Reddit user responded to "u/got-your-back" by stating:  "FLOW blockchain is a real thing, but they did NOT release tokens on the Ethereum blockchain (or any tokens at all, to date). This post is 100% a scam."

49.    Despite being told explicitly that the use of the FLOW Mark in the name of the FP Token was misleading and could cause consumers to believe that it was affiliated with the existing *Flow* Blockchain, the user "u/got-your-back" (who upon information and belief is Defendant Goetz) dismissed these concerns when she responded in reply:  "This token is not related to FLOW blockchain in any way. It is a new Ethereum token. If you took two seconds to read the post you would see that."  *See* **Exhibit D**.

50.    Upon information and belief, Defendants registered the website at domain name <flowprotocol.io> on or about July 27, 2020 in order to advertise the FP Token.  A true and correct copy of the <flowprotocol.io> website is attached hereto as **Exhibit E**.  The

4843-6341-7820

<flowprotocol.io> web site does not have any contact details or personally identifiable information that could identify the founder or anyone involved with the marketing and sale of Defendant's FP Token.

51.     On August 12, 2020, the first transfer of an FP Token was listed on Etherscan, using the confusingly similar ticker $FLOW.  Four days later, on August 16, 2020, public trading of FP Tokens opened at a price per token of $0.41.

52.     The FP Token reached its highest value four days later, on August 20, 2020, with a high on that day of $2.20 per token.

53.     Upon the release of the FP Token in August 2020, many consumers expressed confusion regarding whether the FP Token was affiliated with Dapper or the *Flow* Blockchain. For example, a user on the messaging application Telegram posted a screenshot of the FP Tokens from the cryptocurrency data aggregator website CoinGecko, showing the trading volume of the FP Token and expressed the belief that this was the *Flow* Token affiliated with Dapper.

54.     As another example, in the group-chat platform Discord, several users expressed confusion regarding the affiliation of the FP Token with Dapper and the *Flow* Blockchain:

- On August 12, 2020—the day that the FP Token was released—a Discord user wrote that "Lot of people got scammed..Uniswap just released Flow token, everyone thinking I guess this one."  Another user responded: "is flow protocol fake on Uniswap?? That is not flow right?"

- Later in August 2020, another Discord user wrote: "Hey everyone, some dude on 4chan /biz wrote that this address is the token addr for FLOW. Can anyone confirm? Has quite some traction already. Can't find anything on etherscan and not on the page nor here in the search function."  A Dapper representative on Discord responded:  "Flow is a

-16-

separate blockchain from Ethereum and has no tokens on Ethereum. We have not released any tokens yet and anybody that claims to be flow is lying. We will provide updates here and on our blog about when we release tokens."  The first user responded: "thanks. So some guy is phishing."

- In September 2020, another Discord user wrote: "I think [the FP Token] is numero 1 on coingecko search because people searching/buying the wrong token?"

- In October 2020, a Discord user wrote: "just curious, has flow started trading already?" and linked to the FP Token on CoinBase.  That user later followed-up: "wrong flow nevermind."

- In November 2020, a Discord user wrote: "Can anyone explain what the 'Flow Protocol' token is as shown on Etherscan here. This just seems suspect to me considering that the actual FLOW token is not out there in trade at the moment. So is it related to the project at all or someone's attempt to sew [sic] confusion into the mix and make a profit off of the misunderstanding?"

- In December 2020, a Discord user wrote: "Is FLOW the same that [sic] Flow Protocol?" Another Discord user responded: "No."

55.     These examples of consumer confusion upon the release of the FP Token are attached hereto as **Exhibit F**.

56.     Shortly after the FP Token was first offered for sale in August 2020—and as a result of the confusion surrounding whether the FP Token was affiliated with Dapper and the *Flow* Blockchain—Dapper conducted a diligent investigation in an attempt to determine Defendants' identity and to demand that Defendants cease the infringing use of the FLOW Mark in connection with the FP Token.  It appeared to Dapper that the creator and seller of the FP

Token wished to remain anonymous, as the Flow Protocol website contained no contact information and did not identify any company name, address, or other information. An initial investigation to identify the person or company behind the infringing FP Token proved fruitless at the time.

57.    On October 16, 2020, Dapper sent a cease-and-desist letter to Defendants (who at that point still remained anonymous) through a submission to Namecheap, the domain host of Defendants' <flowprotocol.io> website. In this letter, Dapper demanded that Defendants: (i) remove all reference to the FLOW Mark from Defendants' website and any links thereto; (ii) cease all activities on Defendants' website and any marketing materials that are likely to cause customer confusion (including the use of the FLOW Mark); and (iii) agree not to use any of Dapper's names or marks going forward.

58.    A week later, Dapper received a response from an attorney, Grant Gulovsen. While Mr. Gulovsen did not expressly state who he represented, Dapper understood him to be counsel for the developer of Flow Protocol (who, upon information and belief, is Defendant Goetz). Following multiple exchanges between Dapper and Mr. Gulovsen, the parties were unable to reach a mutually agreeable solution that would result in Defendants ceasing to use the FLOW Mark in its sale, offering for sale, advertising, marketing, and promoting the FP Token. After multiple months of negotiations, during which Mr. Gulovsen stopped providing substantive responses of any kind and instead continued to simply ask for additional time to respond to Dapper's demands to cease and desist, it became clear Defendants were not looking to resolve the dispute amicably.

4843-6341-7820

THE FP TOKEN EXPERIENCES A SUBSTANTIAL INCREASE IN VALUE DUE TO
CONSUMER CONFUSION ON THE SAME DAY THAT THE FLOW TOKEN IS LISTED
FOR PUBLIC SALE INTERNATIONALLY

59.     During the cease-and-desist communications between Dapper and Mr. Gulovsen
between October 2020 and January 2021, the value of the FP Token continued to plummet.
After experiencing its highest value of $2.01 per token on August 20, 2020, the FP Token fell to
its lowest value of $0.008 per token on December 9, 2020.  *See* **Exhibit G**.

60.     Following the quick and steep decline in the value of the FP Token, online
commenters in popular forum-based websites used for discussing cryptocurrency and blockchain
criticized the FP Token and tried to "warn" potential customers that the FP Token was a "scam."
This extended to online criticism of Defendant Goetz, whom commenters referred to as
"scamming everyone."

61.     At the same time as the FP Token's decline, however, the *Flow* Token reached a
point where certain cryptocurrency exchanges made a determination to begin activities to list the
Flow Token.  The *Flow* Token had established goodwill in the cryptocurrency space due to its
affiliation with the popular and established *Flow* Blockchain.  Dapper had also built anticipation
for the release of the *Flow* Token with its various announcements that it would be released in due
course.

62.     On January 27, 2021, the *Flow* Token was listed on an exchange and began
trading internationally (outside of the United States and Canada) to purchasers in eligible
jurisdictions at a start-of-day trading price of $0.38.  Immediately upon the beginning of trading,
the *Flow* Token price adjusted to approximately $8.30 per token.  By February 1, 2021, just four
days later, the *Flow* Token was trading at around $10.00 per token (fluctuating) with a 24-hour

low of $9.00 and a 24-hour high of $12.08.  *See* **Exhibit H**.

63.     On the same day that the *Flow* Token began to be listed on exchanges internationally (January 27, 2021), Defendants' FP Token, following months of stagnation and extremely low value, also experienced a curious and sudden surge in value.  Upon information and belief, this increase in value was caused by consumer confusion due to Defendants' use of the FLOW Mark in the name of the FP Token and in the advertising of the FP Tokens.  Given the months of little to no change in value at extremely low value, there is little else to explain this sudden surge.

64.     Indeed, in the week prior to January 27, 2021, the FP Token was consistently valued at $0.02 per token.  It also had a consistent daily transfer pattern of 9 to 49 transfers per day by 10 to 38 unique addresses.  During this period, the daily number of FP Tokens transferred fluctuated between 160,014 and 1,648,225 tokens per day.  *See* **Exhibit I**.

65.     However, on January 27, 2021—the same day that the *Flow* Token was publicly listed for exchange internationally—the trading price of the FP Token increased by <u>250%</u> to $0.07 per token.  The number of daily transfers also increased by approximately <u>750%</u> to 420 transfers.  The number of unique addresses for the transfers increased by approximately <u>490%</u> to 224.  And the number of FP Tokens transferred on January 27, 2021 increased by more than <u>1,200%</u> to 21,805,800 tokens.  *See* **Exhibit J**.

66.     The sudden spike in activity and value for FP Tokens on January 27, 2021 followed months of decline since the initial launch of FP Tokens.  Upon information and belief, the increase was the result of confusion by consumers who believed that the FP Tokens were affiliated with Dapper, the *Flow* Blockchain, and/or the *Flow* Tokens.

67.     This consumer confusion immediately emerged on social media.  On January 27,

2021, an online commenter observed: "$Flow protocol (FLOW) up 934.2% today. i think a lot of ppl just bought the wrong token."  And on February 1, 2021, a Twitter user asked a Dapper representative:  "Are you merging/integrating with Flow Protocol?"  The Dapper representative responded: "no, they are not a related project and we have zero affiliation with them. Please be ware of imposters."  *See* **Exhibit K**.

68.     This confusion benefits Defendants by increasing participation in its FP Tokens. Conversely, the consumer confusion caused by Defendants' infringing use of the FLOW Mark harms Dapper and the FLOW Mark, as it siphons off, and takes advantage of, the goodwill and positive reputation Dapper had already built in the *Flow* Blockchain and, by extension, the *Flow* Token and FLOW Mark.  Further, it tarnishes Dapper's reputation because the FP Token is not built on the innovative *Flow* Blockchain and because the FP Token had been heavily criticized in online forums by commenters discussing blockchain and cryptocurrencies.

69.     Further, and perhaps most concerning, the confusion harms consumers who incorrectly believe—due to the presence of the FLOW Mark on the infringing FP Token—that they are purchasing tokens that are backed by, and based on, the *Flow* Blockchain.  Currently, U.S.-based consumers are not eligible to purchase *Flow* Tokens on exchanges such as Kraken. Given that access to the *Flow* Token is integral to full participation in the games and applications developed on the *Flow* Blockchain—such as, for example, the ability to purchase "moments" on *NBA Top Shot*—U.S.-based consumers are eagerly awaiting their opportunity to participate in the *Flow* community.  Consumers are harmed by purchasing the FP Token under the mistaken but reasonable belief that they have purchased a token that will allow them to participate in a revolutionary blockchain technology (the *Flow* Blockchain), when it does not.  FP Tokens cannot be used in *Flow* Blockchain games or applications as *Flow* Tokens can, and FP Tokens

4843-6341-7820

have no utility outside of the Ethereum blockchain network on which FP Tokens are built.

70.     As alleged herein, Defendants have used and continue to use the FLOW Mark in such a fashion as to intentionally create a false impression among the consuming public that its FP Token originates from Dapper or is sponsored by, approved by, managed by, and/or affiliated with the *Flow* Blockchain.  Defendants similarly misrepresent the origin and quality of the FP Tokens they have sold by suggesting through the use of the FLOW Mark that the FP Tokens are backed by the *Flow* Blockchain, when they are not.  Defendants continue to engage in these false and deceptive practices.

71.     Defendants' acts were and are likely intended to cause confusion and mistake among the public, consumers, and prospective consumers as to, among other things, (i) the affiliation, connection, and association of Defendants with Dapper, (ii) the origin, sponsorship, or approval of Defendants' FP Tokens by Dapper, and (iii) the nature, characteristics, and quality of Defendants' FP Tokens.  Upon information and belief, Defendants intended to cause such confusion for the purpose of enhancing the commercial value of the FP Tokens.  Such increase of the commercial value of the FP Tokens did in fact occur on and after January 27, 2021.

72.     On information and belief, Defendants knew of Dapper's superior trademark rights in the FLOW Mark prior to adopting the name Flow Protocol.  Even if this were not the case, Defendants were certainly aware of Dapper's senior rights upon receipt of Dapper's domain name complaint to NameCheap, the registrar of Defendants' <flowprotocol.io> domain name.  On information and belief, Defendants' conduct and actions in this case constitute willful and intentional infringement, and this case constitutes an exceptional case under 15 U.S.C. § 1117, entitling Dapper to enhanced damages and recovery of its attorneys' fees and costs of this action.

4843-6341-7820

73.     By reason of the foregoing, Dapper has suffered and will continue to suffer damage to its business, reputation, and goodwill.

74.     Dapper's remedy at law is inadequate to compensate Dapper fully for the injuries it has suffered and is suffering.  Defendants are continuing the foregoing activities and, unless enjoined, will continue to do so, furthering Dapper's irreparable damage and harm.  It is exceedingly difficult or impossible to estimate the amount of compensation which would afford Dapper complete monetary relief for such continuing acts and a multiplicity of judicial proceedings would be required in the absence of appropriate injunctive relief.

### FIRST CLAIM FOR RELIEF

### FALSE DESIGNATION OF ORIGIN

### (15 U.S.C. § 1125(a)(1)(A))

### (AGAINST ALL DEFENDANTS)

75.     Dapper hereby incorporates the allegations set forth in Paragraphs 1 through 74 above as if set forth in full herein.

76.     Dapper has been widely and continuously using the FLOW Mark in connection with the design, development, and implementation of blockchain technology used to develop decentralized software applications, such as digital tokens, cryptocollectibles, and cryptocurrencies—including in connection with the development and implementation of the *Flow* Blockchain—throughout the United States and around the world since at least as early as September 2019.

77.     By virtue of Dapper's extensive and continuous use and promotion of the mark in commerce, Dapper has established significant goodwill, consumer recognition, and exclusive common law rights in the FLOW Mark for the development of blockchain technology and

4843-6341-7820

decentralized software applications throughout the United States and abroad.

78.     Defendants are using the identical FLOW Mark on its <flowprotocol.io> website in connection with the FP Token, including as the ticker name of that FP Token, in the logo of the website, and in the domain name for the website.

79.     Defendants' use of the FLOW Mark in connection with the FP Token—which is a cryptocurrency exchanged via blockchain technology—is confusingly similar to Dapper's priority use of the FLOW Mark in connection with the design, development, and implementation of blockchain technology used to develop decentralized software applications, such as digital tokens, cryptocollectibles, and cryptocurrencies.

80.      Defendants' use of the FLOW Mark in the sale, offering for sale, advertising, marketing, and promoting of the FP Token falsely suggests that the FP Token originated with, was developed by, or is affiliated with Dapper.

81.     Defendants' acts are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with Dapper, or as to the origin, sponsorship, or approval by Dapper of the FP Token.

82.     The aforesaid wrongful acts of Defendants constitute the use of a false designation of origin, false description, or false representation of fact, that is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with Dapper and/or between the FP Token and the *Flow* Token, all in violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)(1)(A)).

83.     Defendants knew or should have known that its statements were false or likely to mislead.

84.     Dapper is informed and believes, and on that basis alleges, that Defendants' acts

have injured or are likely to injure Dapper's image and reputation within and among customers, investors, and current and future affiliates and partners in the blockchain and cryptocurrency space by creating confusion about Dapper's products and services.

85.     Dapper is informed and believes, and on that basis alleges, that Defendants' acts have harmed consumers in the blockchain and cryptocurrency space by creating confusion as to the origin, source, and affiliation of the FP Token.  Specifically, Dapper is informed and believes that consumers have purchased the FP Token under the mistaken belief—caused by Defendants' conduct—that the FP Token was affiliated with Dapper.

86.     As a direct and proximate result of Defendants' illegal activities, Dapper has suffered and will continue to suffer damages, including but not limited to damages for injury to Dapper's business, reputation, and goodwill, in an amount presently unknown and to be ascertained at the time of trial.  On information and belief, Defendants' conduct and actions were willful and intentionally violated Dapper's trademark rights as described herein, rendering this case is exceptional under 15 U.S.C. § 1117.  Dapper is therefore entitled to enhanced damages and recovery of its attorneys' fees and costs in this action.

87.     Defendants' conduct has caused and will continue to cause immediate and irreparable injury to Dapper, including injury to its business, reputation, and goodwill, and will continue to deceive the public unless enjoined by this Court.  Dapper has no adequate remedy at law for the continuing injury and harm.

WHEREFORE, Dapper seeks judgment as set forth herein.

**SECOND CLAIM FOR RELIEF**

**ANTICYBERSQUATTING CONSUMER PROTECTION ACT (ACPA)**

**(15 U.S.C. § 1125(d))**

**(AGAINST ALL DEFENDANTS)**

88.     Dapper hereby incorporates the allegations set forth in Paragraphs 1 through 87 above as if set forth in full herein.

89.     Dapper has common law rights in the FLOW Mark and has used such mark in connection with goods and services in the blockchain and cryptocurrency space.

90.     Defendants registered the domain name <flowprotocol.io> in order to sell, offer for sale, market, advertise, and promote the FP Token, which is a cryptocurrency exchanged via blockchain technology.

91.     Dapper is informed and believes, and on that basis alleges, that Defendants have a bad faith intent to profit from the use of the FLOW Mark notwithstanding Dapper's common law rights in the FLOW Mark.

92.     At the time Defendants registered the domain name <flowprotocol.io>, the FLOW Mark used by Dapper in connection with its blockchain and cryptocurrency services and goods was distinctive.

93.     Defendants' use of the FLOW Mark in the domain name <flowprotocol.io> is confusingly similar to Dapper's priority use of the FLOW Mark in the blockchain and cryptocurrency space.

94.     The aforesaid wrongful acts of Defendants constitute unlawful cybersquatting in violation of the Anticybersquatting Consumer Protection Act (15 U.S.C. § 1125(d)(1)).

95.     Dapper is informed and believes, and on that basis alleges, that Defendants' acts

have injured or are likely to injure Dapper's image and reputation within and among customers, investors, and current and future affiliates and partners in the blockchain and cryptocurrency space by creating confusion about Dapper's products and services and Dapper's affiliation with the domain <flowprotocol.io>.

96.     As a direct and proximate result of Defendants' illegal activities, Dapper has suffered and will continue to suffer damages, including but not limited to damages for injury to Dapper's business, reputation, and goodwill, in an amount presently unknown and to be ascertained at the time of trial.

97.     On information and belief, Defendants' conduct and actions were willful and intentionally violated Dapper's trademark rights as described herein, rendering this case as exceptional under 15 U.S.C. § 1117.  Dapper is therefore entitled to enhanced damages and recovery of its attorneys' fees and costs in this action.

98.     Defendants' conduct has caused and will continue to cause immediate and irreparable injury to Dapper, including injury to its business, reputation, and goodwill, and will continue to deceive the public unless enjoined by this Court.  Dapper has no adequate remedy at law for the continuing injury and harm.  Accordingly, pursuant to 15 U.S.C. § 1125(d)(1)(C), Dapper is entitled to an order transfer of the registration of the <flowprotocol.io> domain name to Dapper.

WHEREFORE, Dapper seeks judgment as set forth herein.

## THIRD CLAIM FOR RELIEF

## COMMON LAW TRADEMARK INFRINGEMENT

## (AGAINST ALL DEFENDANTS)

99.     Dapper hereby incorporates the allegations set forth in Paragraphs 1 through 98

above as if set forth in full herein.

100.    Dapper has been widely and continuously using the FLOW Mark in connection with the design, development, and implementation of blockchain technology used to develop decentralized software applications, such as digital tokens, cryptocollectibles, and cryptocurrencies—including in connection with the development and implementation of the *Flow* Blockchain—throughout the United States and around the world since at least as early as September 2019.

101.    By virtue of Dapper's extensive and continuous use and promotion of the mark in commerce, Dapper has established significant goodwill, consumer recognition, and exclusive common law rights in the FLOW Mark for the development of blockchain technology and decentralized software applications throughout the United States and abroad.

102.    Dapper has priority common law trademark rights in the FLOW Mark as used in the blockchain and cryptocurrency space.

103.    Dapper uses the FLOW Mark in the blockchain and cryptocurrency space in the sale, offering for sale, advertising, marketing, and promoting of its goods and services throughout the State of New York and throughout the United States of America.

104.    Defendants similarly use the FLOW Mark in connection with the sale, offering for sale, advertising, marketing, and promoting of the FP Token.

105.    The aforesaid wrongful acts of Defendants constitute the infringement of Dapper's common law trademark rights in the FLOW Mark.

106.    On information and belief, Defendants' conduct and actions were willful and intentionally violated Dapper's trademark rights as described herein.

107.    As a direct and proximate result of Defendants' illegal activities, Dapper has

4843-6341-7820

suffered and will continue to suffer damages, including but not limited to damages for injury to Dapper's business, reputation, and goodwill, in an amount presently unknown and to be ascertained at the time of trial.

108.    Defendants' conduct has caused and will continue to cause immediate and irreparable injury to Dapper, including injury to its business, reputation, and goodwill, and will continue to deceive the public unless enjoined by this Court.  Dapper has no adequate remedy at law for the continuing injury and harm.

WHEREFORE, Dapper seeks judgment as set forth herein.

## **FOURTH CLAIM FOR RELIEF**

## **COMMON LAW UNFAIR COMPETITION**

## **(AGAINST ALL DEFENDANTS)**

109.    Dapper hereby incorporates the allegations set forth in Paragraphs 1 through 108 above as if set forth in full herein.

110.    Dapper is informed and believes, and on that basis alleges, that Defendants have engaged in and continue to engage in unfair competition by using the FLOW Mark in connection with the FP Tokens with the intention of interfering with and/or trading on the business reputation and goodwill engendered by Dapper through hard work and diligent effort, "passing off" its FP Tokens as those of Dapper and/or as being supported by the *Flow* Blockchain, to entice consumers to buy the FP Tokens from Defendant.

111.    On information and belief, Defendants' conduct and actions were willful and intentionally violated Dapper's trademark rights as described herein.

112.    As a direct and proximate result of Defendants' illegal activities, Dapper has suffered and will continue to suffer damages, including but not limited to damages for injury to

4843-6341-7820

Dapper's business, reputation, and goodwill, in an amount presently unknown and to be ascertained at the time of trial.

113.    Defendants' conduct has caused and will continue to cause immediate and irreparable injury to Dapper, including injury to its business, reputation, and goodwill, and will continue to deceive the public unless enjoined by this Court.  Dapper has no adequate remedy at law for the continuing injury and harm.

WHEREFORE, Dapper seeks judgment as set forth herein.

## PRAYER FOR RELIEF

1.    That this Court temporarily, preliminarily, and permanently enjoin and restrain Defendants, their officers, directors, members, managing members, servants, employees, attorneys, agents, representatives, distributors, and all other persons acting in concert or participation with Defendants from using the FLOW Mark in connection with the ticker symbol for the FP Tokens, blockchain, or any other cryptocurrency;

2.    That this Court order the transfer of the <flowprotocol.io> domain name to Dapper pursuant to 15 U.S.C. § 1125(d)(1)(C);

3.    That this Court award Dapper compensatory damages and order Defendants to pay restitution as provided by law;

4.    That this Court award Dapper damages for the purposes of corrective advertising;

5.    That this Court award Dapper enhanced damages as provided by law;

6.    That this Court order Defendants to account to Dapper for all profits from its infringement of the FLOW Mark;

7.    That, at Dapper's election at trial, this Court award Dapper statutory damages for Defendants' violation of 15 U.S.C. § 1125(d);

4843-6341-7820

8.     That this Court award Dapper its costs, disbursements, and attorneys' fees incurred in bringing this action;

9.     That this Court freeze all of Defendants assets in FP Tokens and other currencies and items of value in order to cease the infringement in this action and to ensure Defendants can pay the damages, attorneys' fees, and costs awarded by the Court;

10.    That this Court award Dapper prejudgment interest as provided by law; and

11.    That this Court award Dapper such other and further relief as it may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Dapper requests a trial by jury on all triable issues.

Dated:  February 12, 2021                    PILLSBURY WINTHROP SHAW PITTMAN LLP


                                        By:   /s/ Anne Lefever
                                              Anne Lefever
                                              31 West 52nd Street
                                              New York, NY 10019
                                              Tel: (212) 858-1000
                                              Fax No. (212) 858-1500
                                              Email: anne.lefever@pillsburylaw.com

                                              Vijay K. Toke (*Pro Hac Vice
                                              Application Forthcoming*)
                                              Four Embarcadero Center, 22nd Floor
                                              San Francisco, CA 94111-5998
                                              Tel No.+1.415.983.1089
                                              Fax No. +1.415.983.1200
                                              Email: vijay.toke@pillsburylaw.com

Stacie O. Kinser (*Pro Hac Vice Application Forthcoming*)
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Tel No +1.415.983.1022
Fax No. +1.415.983.1200
Email: stacie.kinser@pillsburylaw.com

Alekzandir Morton (*Pro Hac Vice Application Forthcoming*)
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Tel No +1.415.983.1216
Fax No. +1.415.983.1200
Email: alekzandir.morton@pillsburylaw.com

*Attorneys for Plaintiff*
*Dapper Labs Inc.*

4843-6341-7820